ROMARE v. BROKEN ARROW COAL & MINING CO. et al.

(Circuit Court, N. D. Alabama, S. D.   February 19, 1902.)

1. RECEIVERS—GROUNDS FOR APPOINTMENT—MORTGAGE FORECLOSURE.

The trustee in a mortgage securing bonds of a corporation owning about 3,000 acres of coal and timber lands, on request of the holders of about one-fourth of the bonds, brought suit to foreclose the mortgage, and applied for the appointment of a receiver to take possession of and operate the property. No interest had been paid on the bonds for 17 years, and the bill alleged, on information and belief, that the company was insolvent, that the mortgaged property was of less value than the amount due on the mortgage, and that some three or four hundred acres of the land was in possession of a lessee, which was impairing its value by taking large quantities of coal therefrom. There was no allegation of fraud, dishonesty, or incompetency in the management. The charge of insolvency was denied, and not proved; nor was there any definite evidence as to the value of the mortgaged property, the quantity of coal being mined, or the effect of the work in developing the mines. On behalf of defendant it was alleged, and there was evidence tending to prove on the hearing, that the bondholders had at all times been fully cognizant of the operations of the company, in which they had, to some extent, participated; that, up to about two years before, such operations had not been profitable, but there had at that time been a change in the management, since which time a large amount had been expended in developing the mines, which were then being operated under advantageous leases. There was testimony of disinterested witnesses that since that time the property had increased in value, and gave fair promise of yielding returns to the stockholders and bondholders. It was also shown that a majority of the bondholders approved of the management, and believed the appointment of a receiver would be detrimental to their interests. *Held*, that such evidence did not warrant the appointment of an operating receiver pending the suit.

2. SAME.

The fact that the bondholders of a corporation owning coal lands permitted the interest to become in arrears for 17 years before bringing suit to foreclose, with full knowledge of the operations of the company, during the last 2 years of which time it expended large sums in developing the property, may properly be considered in determining their equity to demand the appointment of a receiver; and the appointment ought not to be made, under such circumstances, against the opposition of the company and a majority of the bondholders, without clear proof of mismanagement, and that the receivership would better subserve the interests of all of the bondholders, at least, and is necessary for their protection.

In Equity. Suit to foreclose mortgage.   On motion for appointment of receiver.

This case comes before me on motion of complainant for a receiver, and has been argued and submitted on bill and answer. and testimony as shown by the note of submission. The case, so far as it is necessary to state it, is this: Complainant, Paul Romare, is the surviving trustee under a deed of trust made by the Broken Arrow Coal & Mining Company on the 1st of November, 1883, to secure a total issue of 100 bonds, for $500 each, payable on the 1st day of December, 1903. with semiannual interest at the rate of 7 per cent. per annum. No interest has been paid since the 1st day of December,

1884, and it is alleged in the bill that the sum of $57,550, with interest thereon from the different dates when the coupons fell due, is now due to the owners of the bonds, exclusive of the principal. The deed provides, on default in the payment of interest continuing for six months, it shall be the duty of the trustee, upon the requisition in writing by the holders of not less than one-fourth of the total issue of bonds then outstanding, accompanied by adequate indemnity against costs and expenses, to enforce the rights of bondholders by suits in equity, or otherwise, as the trustee may be advised is most effective. In compliance with the request of the holders of 26 of the bonds (being more than one-fourth of the whole issue outstanding), the trustee, having been properly indemnified, files his bill to foreclose the mortgage. It is alleged, on information and belief, that the Broken Arrow Company is insolvent, and that the mortgaged premises are of less value than the amount due upon the bonds and·coupons, and that since the execution of the deed of trust the Broken Arrow Coal & Mining Company has made a lease to the Coal City Coal & Coke Company, which is also made a defendant to the bill, which is in possession of three or four hundred acres of valuable land, mining coal therefrom every day in large quantities, and that, "by every ton of coal which is raised and moved from the lands in the mining operations, it is impairing the security of the bonds and coupons, and that after the mines are exhausted the land will be useless and valueless for any other purpose," etc. The prayer is for foreclosure, and for the appointment of a receiver to take possession of the mortgaged property, with power to operate it and to secure the earnings thereof until foreclosure sale. The answer sets up, among other things, that it was well known to the bondholders that respondents could not pay the interest unless a large amount was invested in opening and developing the mines, and that an agreement was had between the respondents and the holders of the first mortgage bonds, with the knowledge and consent of the complainant, that respondent should procure the necessary amount of money to be expended on the property to develop it until it could be put upon a paying basis, and that if this were done no attempt would be made by complainant and the bondholders to foreclose the mortgage; that, in consideration of this promise and agreement, respondents since the making of the mortgage have expended more than $48,000 in the development of the property; and that the bill to foreclose is premature and in violation of the agreement between the respondent and the holders of the first mortgage bonds. The answer also denies that the Broken Arrow Coal & Mining Company is insolvent, or that the premises are of less value than the debt due, or that the Coal City Coal & Coke Company is in any way impairing the security of the bonds; and it is also denied that the Coal City Coal & Coke Company is working or exhausting the mines in any manner. The answer sets up that the appointment of a receiver under the existing conditions would be disastrous and ruinous to all parties in interest,—not only the respondents, but the bondholders as well; that, after the expenditure of this large sum of money put in the property by the respondents, it will soon be placed upon a paying basis, if allowed to be operated; that the mines are being operated under an arrangement with the Northern Alabama Coal, Iron & Railroad Company, which company operates the mines under an arrangement with the Talladega Furnace Company, the owners of a large furnace at Talladega, Ala., and the Birmingham & Atlantic Railroad Company, which owns a railroad extending from Talladega to a point not far distant from the mines, and that the success of the operation of the mines is altogether dependent upon their being operated in connection with said furnace and railroad; that it is fully realized by the holders of three-fourths of the mortgage bonds of the Broken Arrow Coal & Mining Company that the well-being of the enterprise depends upon its being operated as aforesaid, and they object to the foreclosure, or to the appointment of a receiver for the property, and allege that such proceedings are not in the interest of the bondholders, but in the interest of complainant and a few minority bondholders, who seek to thereby force the holders of the majority of the bonds to purchase their interests at prices dictated by them, without regard to the disastrous effect of the proceedings upon the trust estate. It is further alleged that the trustee has been removed since the filing of the

proceeding, by a majority of the bondholders, under a power to that effect in the deed of trust. It is not necessary to notice this allegation further, in the view I take of that question on the other branch of the case.

J. J. Willett, B. F. Abbot, and Jas. T. Greene, for complainant.
Knox, Bowie & Dixon, for respondents.

JONES, District Judge. The appointment of a receiver upon the evidence before me would be as hazardous as a surgeon's undertaking an operation upon his patient in the dark. The insolvency is charged on information and belief. It is met by a positive, but merely literal, denial. Such a denial, however, is good enough for a charge thus made. The only direct evidence of the value of the trust property is the "opinion" of one of the complaining bondholders that the "market value of the property is less than one hundred thousand dollars." The bonds are secured by a deed of trust "upon all the coal and other minerals" in certain described lands in St. Clair county, amounting in all to 3,156 acres, "together with the engines and machinery now used in operating the works, and such as may hereafter be used in operating the mines." Whether engines and machinery of any considerable value are now upon the premises is not stated. The answer alleges that the present management has spent in development and opening mines $48,000, which the affidavits show has been done in the last two or three years. Complainant disputes the amount thus expended, but it is evident that large sums of money have been expended upon the mines quite recently. There is nothing to show that this money has not been judiciously expended, or that it has not correspondingly advanced the value of the mortgaged premises. There is neither allegation nor proof that the property described in the mortgage is all the property of the defendant corporation, save in the affidavit of four complaining bondholders that the coal and timber are the only security. The character and value of the timber on the land are not given. The Coal City Coal & Coke Company, of whose operations complaint is made in the bill, is charged to be in possession of only "three or four hundred acres" of the entire tract. As to the remaining 2,700 or 2,800 acres, no information is given. It does not appear how much money has been expended in development on them in the earlier operations of the company, and whether the development has added to the value, or how they compare in value with the "three or four hundred" acres mentioned. The court is not informed how far the coal and "other minerals" have been developed on the entire property, or as to the character and quantity or value of coal and other minerals therein, or how they lay, or how advantageously they may be worked. It is not shown that the respondent company owes other debts than those secured by the deed of trust. In this state of the proof, it cannot be declared, in favor of one upon whom the burden of proof rests, that the respondent company is insolvent.

It is shown by the affidavits of Alverson, Moore, Hamilton, and Daughdrill, who are entirely disinterested, and speak with knowledge of the past and present conditions of the property, that until lately the mines were not sufficiently developed to operate them at a profit, but that in the last two years the Northern Alabama Coal, Iron &

Railroad Company, out of its own funds, has spent many thousands of dollars in developing, repairing, and replacing property on the premises, and has about succeeded, after the expenditure of large sums of money without any profit to itself, in placing the property in a condition where coal can be mined at a profit, and has at the same time greatly enhanced the value of the mines, which these witnesses assert are now more valuable than at any time since the making of the trust deed. Each of these witnesses testifies positively that nothing is being done to injure the security of the bondholders, but, on the contrary, the property is being developed and greatly enhanced in value. Soley, the general manager of the Broken Arrow Coal & Mining Company, testified to the same effect, and that, from the time of the making of the trust deed until recently, the management of the respondent company has been conducted largely by certain of the bondholders who now seek foreclosure; but their management resulted disastrously; that since the present officers have been in charge of the property, and the large expenditures made upon it, it has increased in value, and gives promise of yielding returns to the stockholders and bondholders. Four of the complaining bondholders, however, state "as absolutely true that the security for the bonds is being impaired every day by the mining of coal and the cutting of timber, and that the chief and only security for the payment of the bonds secured by the deed of trust is the coal and timber upon said lands, and that the same is being exhausted every day by the mining of said coal and the cutting of said timber." They do not state the quantity of coal and timber which is being removed, nor how much money is being spent in development in the present operations, or how or in what respect the present operations are harmful to the property, save that coal and timber are being taken away from the mines. Coal and timber in considerable quantities may be taken, and yet, if there is a large quantity of coal or other minerals left upon the land, the development and the enhanced value therefrom to the remainder might more than compensate for the value of the coal and timber taken in the operations of the property, and leave it of greater value than before. The statement of these four witnesses, the honesty of which is not at all doubted, amounts to no more than their opinion that the security is being impaired merely because coal and timber are being taken from the mines, without any reference to the value and amount of the coal which remains, or the expenditures made in development, or the greater value which may thereby have been imparted to the property. It does not overcome the testimony of Alverson, Moore, Hamilton, and Daughdrill on these points.

Little need be said at this time of the defense that Romare and the bondholders agreed, if expenditures were made upon the property so as to put it upon a paying basis, they would forego the right of foreclosure, and that, in consequence of such agreement, large sums of money have been expended, whereby the property is now put upon a paying basis. The allegations as to this are vague and uncertain; it not being stated how much money was to be expended, or how long forbearance was to continue. So far as concerns Romare and the complaining bondholders, it suffices to say that the charge is made on "information and belief," and that they deny it most positively. It is

hardly necessary to say that a trustee has no authority to bind bond-holders not to enforce their security in case of default, when neither the trust deed nor the individual bondholders give that authority, nor that, without specific authority to that effect, one bondholder, or a majority of them, cannot bind other bondholders to forego their rights under the trust deed. Upon the present state of the evidence, there is nothing which estops Romare and the complaining bondholders from insisting upon a foreclosure.

It is proper to refer to some other features of the case. The property is now being operated, and there is testimony which, in the least favorable view of it, certainly tends to show that the parties operating the mines, by reason of their ownership or control of a railroad and furnace, can find markets more advantageous for the coal than any other parties could. The terms of this contract, or the magnitude of the operations under it, or whether it has resulted profitably or not, are not stated. The only information given the court is that the success of the operation of the mines is "altogether dependent upon their being operated in connection with the furnace and railroad, and that under the present management the property has greatly improved, and that, if the management is allowed to continue to operate, there is reason to believe that the indebtedness of the company can soon be paid out of the earnings." The court is without any information which would enable it to judge whether this opinion is well or ill founded. It is, however, the opinion of the present management, stated under oath; and its correctness is largely supported by the affidavits of Alverson, Moore, Hamilton, and Daughdrill. All five of these witnesses testify positively that the company can operate the property to greater advantage than a receiver could, and the complainant has not furnished any testimony to the contrary. Nearly three-fourths of the bondholders insist that a receiver would be exceedingly detrimental to them. While these considerations present no bar to a foreclosure after the long default, they certainly are weighty in determining the propriety of a receiver pending foreclosure. The court cannot shut its eyes to the further facts that the complaining trustee and the minority bondholders for nearly 17 years past, in which there has been continuous default in the payment of interest, have forborne, so far as the record shows, to take any steps to collect their debts; that during this long period the property has been mined by the company in various ways,—either on its own account, or by persons who paid royalties,—without keeping down the interest, while in the last two years a new management has intervened, which has spent considerable sums of money in developing the property, under a contract of some sort with the company. These pregnant circumstances, unexplained, certainly tend to show that there was some agreement or understanding among a number of the bondholders, at least, to forbear the collection of their debt, and trust to future operations to place it on a better basis, and that the money spent in developing the property was expended on some such understanding. If not, why should the trustee remain inactive during this long period, and the complaining bondholders refrain from insisting on their right to compel him to institute foreclosure proceedings? Persons interested in property are

charged with knowledge of its vicissitudes and condition. It is unnecessary now to consider how far mere silence of bondholders, with knowledge of the agreement under which the money was expended, estops them from the right of foreclosure. It suffices here to say that the trustee and the complaining bondholders make most positive and direct denial of notice or knowledge of any agreement of the kind. Nevertheless, their inactivity and silence for so many years, and after so many and long-continued defaults, may be rightly considered in determining the equity of their sudden demand for a receiver.

It is contended on the one hand, and denied on the other, that the complainants seek foreclosure to compel the majority bondholders to purchase at a price beyond the value of the bonds, rather than submit to the sacrifice entailed by a receiver and foreclosure. In view of the vicissitudes of this property, the long delay in the payment of interest, and the various efforts to extricate the enterprise, and the abundant room for honest difference of opinion as to the best method of winding up the trust, I cannot see that this charge is made out; but, if it were, it is immaterial, since conditions have arisen which give creditors the clear and undoubted legal right to proceed, regardless of the motive which controls them. It is urged on the other hand that the majority bondholders and the managers of the property of the Broken Arrow Coal & Mining Company are so conducting it as to force the minority bondholders to sell at a sacrifice. Bearing in mind the history of this property, the long unanimity of the bondholders in foregoing their right to foreclose, and the evident hope of the majority that the debt can be worked out, it does not seem to me that this view is just. The differences of opinion among the bondholders are doubtless honest, and each side is merely trying to take care of itself without any nice calculation as to the effect of its position on the other side. The best solution of such a situation is not in litigation. Amicable adjustment would be quicker and better; but it is for the parties, not the court, to determine thus to settle the dispute.

The complaining trustee and bondholders ask for a receiver, with power to operate. They evidently believe it is not to the interest of the bondholders to shut down pending foreclosure, but, rather, to keep the mines as a going concern. The evidence, as I have stated, does not justify the conclusion that the value of the property is being impaired by the present operations, or that the company is insolvent. Suppose it is insolvent; still the question arises whether it is best for the cestuis que trustent to keep the property as a going concern pending foreclosure, or to shut down the mines. If the operations are to continue, they must be carried on by the respondent or by a receiver. In determining by whom this must be done, it should be borne in mind that the real complaint is not that the mines are being unskillfully, imprudently, or dishonestly worked, but that nothing has resulted, so far, to keep down the interest. Whether there is a profit or not, we are not told. If there be a profit which has been applied to improvements or other debts, instead of being paid on the interest, the court, by an order sequestrating the income, could cure that evil. If the management is in danger of contracting debts for materials, supplies, and labor for which liens might be claimed superior

to the mortgage debt, the management could be easily controlled in this respect. So far as the evidence shows, if the mines are to be operated at all, it should be done by the present management, subject to the control of the court, rather than by a receiver. Upon the evidence, it is apparent that a receiver would not have the advantages of profitable operation possessed by the management, and a change of policy or disarrangement of the contracts under which the company is now being operated might result disastrously to respondent company as well as the creditors. If the present management is not making money, it is not at all probable that a receiver would. The alternative is plain,—either to allow the operations by respondent to continue, under proper orders of the court, or else suspend operations altogether. If it is best to shut down, the appointment of a receiver is not necessary to accomplish that result. The court could order the respondent to shut down the mines and put a watchman in charge, or the court might put a deputy marshal in possession, to prevent trespasses upon the premises, and the deterioration of machinery, and the taking out of coal, until the property could be sold. This would be far less expensive and detrimental than the appointment of a managing receiver. In no view of the situation, as it now appears, will any good be accomplished by the appointment of a receiver to operate the mines, and much evil and increased cost might result from it. Three-fourths of the bondholders—the class most interested in the property—insist that it would be harmful.

With the meager proof presented upon many matters which enter into the proper disposition of this property pending foreclosure, the court cannot foresee what relief in this respect may be necessitated by the future developments of the litigation. I will only decree now, upon the case as made, that a receiver ought not to be appointed; but the decree will be without prejudice to the right to renew the motion if, upon further proof, it be made to appear that the mortgage security is being impaired, or that a receiver will be beneficial to the enforcement of the rights of the cestuis que trustent.